UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

LOUISIANA CRAWFISH                    CIVIL ACTION NO. 10-CV-348
PRODUCERS ASSOCIATION-
WEST, ET AL.

VERSUS                                JUDGE DOHERTY

AMERADA HESS CORPORATION,             MAGISTRATE JUDGE HANNA
ET AL.

THIS PLEADING APPLIES TO ALL CASES

## *REPORT AND RECOMMENDATION*

Before the undersigned, on referral from the District Judge for a report and

recommendation, are the defendants' motions to dismiss pursuant to Rule

12(b)(6). [Rec. Docs. 328-333, 340] This case comes to this court by way of

removal, and prior to its removal, multiple claims involving multiple plaintiffs and

multiple defendants were cumulated into one action under state law. After

considering the pleadings as most recently amended, briefs, and oral arguments of

the parties, and for the reasons set out below, the claims had to be separated into

individual related cases in order to address the threshold issue of the court's

jurisdiction, which is inextricably intertwined with the substantive law analysis.

1

Thus, while this report contains recommendations that will be dispositive of some claims in all cases, the motions will subsequently be analyzed as to each individual plaintiff's claim in each individual case in separate reports and recommendations. For the reasons which follow, it is recommended that the motions be GRANTED as to some defendants, DENIED IN PART as to some defendants and that rulings be DEFERRED on these remaining defendants pending the report and recommendation on each individual plaintiff's case.

### *Factual and Procedural Background*

Plaintiffs allege they are commercial crawfishermen, who are all members of the plaintiff association Louisiana Crawfish Producers Association-West, and who fish(ed) the Atchafalaya Basin waters to harvest crawfish.  In their original petition, they alleged that since the mid-1980's, the non-insurer defendants' activities in building/operating pipelines and oil and gas access canals included the construction and maintenance of artificial dams with spoil and dredge material that blocked the natural flow of water in the "Buffalo Cove Area."[1]   The canals and associated barriers, together with the discharge of pollutants and spoil/dredge

---

[1]      [Rec. Doc. 1-6 ,p. 4-6; Rec. Doc. 1-7, p. 4-5].  The Buffalo Cove Area includes three individual water management units initially identified in plaintiffs' Third Supplemental and Amending Petition [Rec. Doc. 1-7, p. 4-5], and re-identified in Article 111 of the Fifth Supplemental and Amending Petition [Rec. Doc. 280, p. 4-5].

material, are alleged to have impacted the quality of the water to the point that oxygen levels were severely reduced causing the crawfish harvest to be adversely affected or eliminated.[2]  As a result, the plaintiffs alleged that they have suffered economic losses, among other items of damages, because the Buffalo Cove Area is no longer a viable location for commercial crawfishing.

### A.    The Cumulation in State Court

The original Petition for Damages was filed in the Sixteenth Judicial District Court for the Parish of St. Martin,  Louisiana.  In that petition, the plaintiffs were described as "men and women who have previously earned their living as commercial fishermen in the Buffalo Cove area." [Rec. Doc. 1-6, Para. 4, p. 4]  The petition further asserted that all of the plaintiffs have suffered damages "that are virtually identical, varying only in degree.… as a result of the exact same acts of fault."  [Rec. Doc. 1-6, Para. 9, p. 5]  Plaintiffs further alleged their entitlement to cumulate their causes of action per La. C.C.P. art. 463. [Rec. Doc. 1-6, Para. 3, p. 4]

Early in the litigation and prior to removal to this court, the defendants challenged the cumulation of the multiple claims into one lawsuit.  Applying

---

[2]      Rec. Doc. 1-6 p. 6.

Louisiana state law, the state district court found that the multiple plaintiffs'

claims against multiple defendants were properly cumulated, and the defendants'

Exception of Improper Cumulation was overruled.  In its reasons for ruling, the

state district court acknowledged that "the Court may later find that the claims

against the different classes of defendants or different defendants might be better

tried separately,…."  [Rec. Doc. 1-11, p. 34]

> B.     *The Final Judgment Dismissing All State Law Claims*

Also prior to removal, the claims of the plaintiffs brought under state law

were dismissed pursuant to an exception of no cause of action; however, the state

district court expressly recognized that the plaintiffs' claims under maritime law

were reserved. [Rec. Doc. 162-2, p. 6]  The decision dismissing the state law

claims, which is now final, was affirmed by the Louisiana Third Circuit Court of

Appeal, which stated in pertinent part:

> The trial court's dismissal of Plaintiffs' state law claims is based on
> the rule of *Robins Dry Dock & Repair v. Flint*, 275 U.S. 303, 48 S.Ct.
> 134, 72 L.Ed. 290 (1927) which, broadly stated, operates to deny a
> plaintiff recovery for economic loss resulting from physical damage
> to property in which he has no proprietary interest . . .  In this appeal,
> plaintiffs argue that they fall within the exception to *Robins* afforded
> to commercial fisherman, as recognized in the federal district court
> ruling of *Louisiana ex rel. Guste v. M/V TESTBANK,* 524 F. Supp.
> 1170 (E.D. La. 1981), and in *Union Oil Co. v. Oppen*, 501 F.2d 558

(9th Cir. 1974).  Plaintiffs also rely upon two other federal district court cases in which, they contend, other similarly-situated claimants have recovered economic damages under state tort law.  *See Shaughnessy v. PPG Indus., Inc.*, 795 F.Supp. 193 (W.D.La. 1992) and *Maddox v. Int'l Paper Co.,* 47 F.Supp 829 (W.D.La. 1942). Defendants respond that *Shaughnessy* and *Maddox* are distinguishable, in that those plaintiffs were riparian landowners as well, and that the one Louisiana state court case to address this issue, *Dempster v. Louis Eymard Towing Co., Inc.,* 503 So.2d 1136 (La. 1987), held that fisherman did not have a cause of action for economic loss arising from the destruction of a fishing site.  After reviewing the above jurisprudence, and the many other cases cited by both sides to this controversy, we find Defendants' arguments to be persuasive

* * *

[W]e find that the trial court properly granted Defendants' exception of no cause of action as to Plaintiffs' state law claims.[3]

As a result of this decision and the denial of writs by the Louisiana Supreme Court, all that remained pending in the state-court litigation at the time of removal were claims allegedly brought under the general maritime law.[4]

## C.    The Removal and Subsequent Proceedings

---

[3]    *Louisiana Crawfish Producers Association-West v. Amerada Hess Corporation*, 2005-1156 (La. App. 3 Cir. 7/12/06), 935 So.2d 380, 382-383, 385, *writ denied*, 2006-2301 (La. 12/8/06), 943 So.2d 1094.

[4]    This Court notes, however, that there are claims brought against the various liability insurers of the non-insurer defendants under Louisiana's Direct Statute, La. R.S. 22:1269, that were alleged in the plaintiffs' Fourth Supplemental and Amending Petition filed in state court after the judgment by the Third Circuit Court of Appeal became final. [Rec. Doc. 1-7 pp. 19-48].

On March 1, 2010, the cumulated matter was removed to this court by Associated Electric & Gas Insurance Services Limited ("AEGIS"), named by the plaintiffs as the alleged insurer of the defendant Anadarko Petroleum Corp., with the written consent of all other remaining defendants who had been properly served as of the removal date.  [Rec. Doc. 1, 1-2]  Subject matter jurisdiction supporting removal was based on 28 U.S.C. §1331 as an action falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201, *et seq.*  No party challenged the removal of the cumulated action but the undersigned ordered briefing on the jurisdictional issue.  After considering the briefs, the undersigned found the court had subject matter jurisdiction and that the case had been properly removed.  [Rec. Doc. 140]

Beginning July 30, 2010, the defendants filed multiple motions for summary judgment, seeking dismissal of the plaintiffs' remaining claims on the basis that maritime law does not provide a remedy to the plaintiffs because of the prohibition of 'group or enterprise" liability under maritime law.  [Rec. Doc. 162][5]  The undersigned recommended that the motions be granted to the extent that the plaintiffs cannot establish causation through such theory.  [Rec. Doc . 263, p. 18]

---

[5]     This motion was adopted by all the defendants pursuant to the Case Management Order. [Rec. Doc. 226-2]

However, because the claims had been cumulated under state law, and because

there had never been any effort to allege specific claims, by specific plaintiffs

against specific defendants that would sound in maritime tort, the undersigned also

recommended:

> that the plaintiffs be given leave to amend their petition, pursuant to
> Fed. Rule Civ. P. 56(e), to allege a specific harm, to a specific
> plaintiff(s), caused by the conduct of a specific defendant(s), with
> sufficient factual detail to establish a maritime tort for each, within
> the parameters of Fed. Rule Civ. P. 8 as interpreted by *Bell Atlantic v.*
> *Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, ----U.S.----,
> 129 S.Ct. 1937 (2009). [Rec. Doc. 263, p. 18]

The recommendations were adopted by the district court on March 16, 2011.

[Rec. Doc. 269]

The defendants also filed motions for summary judgment seeking dismissal

of the plaintiffs' claims under the rule of *Robins Dry Dock & Repair v. Flint*, 275

U.S. 303 (1927), because none of the plaintiffs could demonstrate economic losses

caused by damage to anything in which they have a proprietary interest.  [Rec.

Docs. 191][6]  In response to the motions, the plaintiffs argued that as commercial

fishermen, they should be excepted from application of the *Robins Dry Dock* rule,

to which the defendants urged that the exception either does not exist or does not

---

[6]     This motion was likewise adopted by all the defendants pursuant to the Case Management
Order.  [Rec. Doc. 191]

apply in the instant case.  Until the complaint was amended and the allegations were evaluated to determine if a maritime tort existed for each plaintiff against any or all of the defendants, determination of the issue of whether the rule of *Robins Dry Dock* applied was premature.  As a consequence, the undersigned recommended that those motions be denied as premature, without prejudice to the rights of the defendants to raise the issue again should it become necessary. [Rec. Doc. 336]  The recommendation was adopted by the district court on August 23, 2011.  [Rec. Doc. 344]

On May 16, 2011, in response to the court's order, the Fifth Supplemental and Amended Complaint was filed, a pleading of 174 pages and more than 413 paragraphs in length.  [Rec. Doc. 280]  In response, the defendants collectively filed motions to dismiss pursuant to Rule 12(b)(6), urging that despite amendment, the plaintiffs have failed to comply with the court's order. [Rec. Docs. 328-333, 340] Plaintiffs opposed the motions by memorandum on September 28, 2011. [Rec. Doc. 353]  The movers responded by supplemental memorandum on October 18, 2011.  [Rec. Doc. 361]  The undersigned heard lengthy oral arguments from the parties on October 25, 2011.

D.     *The Positions of the Parties*

8

The defendants assert that the plaintiffs' attempt at amendment of the pleadings "comes nowhere near" satisfying the pleading requirements of the court. [Rec. Doc. 340, p. 9]  They argue that (1) plaintiffs' declaration in the amended pleading that they "re-urge and re-aver" all of the allegations of their previous complaints and their continued descriptions of "group" and combined fault by the multiple defendants is an effort to maintain the already rejected "group" or "enterprise" theory of recovery not recognized under maritime law; (2) plaintiffs continue to combine the three separate areas at issue – Buffalo Cove, Cocodrie Swamp, and Beau Bayou – into the single defined term "Buffalo Cove" or "Buffalo Cove Area," ignoring the court's ruling that such descriptors are insufficient differentiations between navigable waters, other waters, and land; (3) plaintiffs' allegations "on information and belief" as to activities of the defendants alleged to violate well and pipeline permits disregard the court's call for particularity; and (4) plaintiffs' amended complaint fails to satisfy the basic requirements for pleading the existence of a maritime tort.  [Rec. Doc. 340-1, pp. 4-5]

In response, Plaintiffs assert that the tortious conduct of the defendants and the injury flowing therefrom involved dredging from vessels on navigable waters of the United States. They assert that the defendants' actions in dredging canals

9

and placing the spoil banks at issue had the potential to and did disrupt navigation and maritime commerce and that the defendants' activity – dredging from vessels on navigable waters – is a traditional maritime activity.  [Rec. Doc. 351-3, p. 2, 4] Plaintiffs argue that the amended complaint at issue specifically identifies the tortious acts of each defendant as to time and place and specifically identifies the location of each plaintiff's fishing activity.  [Rec. Doc. 351-3, p. 5]  Finally, Plaintiffs reject the argument that they have attempted to re-urge claims based on the "enterprise" or "market" theory, countering that the defendants, by not particularizing their defenses and arguments, have attempted to present an improper group defensive position.

### E.    The Jurisdictional Issue

This Court has already found that, since all the potential state law claims have been dismissed by a judgment that is now final, "the only claims the plaintiffs can possibly have are those that would be based on maritime law...." [Rec. Doc. 336][7]  Thus, the substantive question made subject of the pending Rule

---

[7]      This Court again notes the presence of the claims against the insurer defendants based on Louisiana's Direct Action Statute, however, in order for there to be recovery against the insurers, there must be liability on the part of the policyholder, and that liability would have to be based on maritime law given the final judgment dismissing all of the state law claims by the Louisiana state court.  The plaintiffs have alleged no extra-contractual claims against the insurers.

12(b)(6) motions is whether the plaintiffs' Fifth Supplemental and Amended Complaint [Rec. Doc. 280] states, <u>as to each plaintiff</u>, viable maritime tort claims sufficient to maintain such claim(s) under general maritime law.

However, as a result of the latest amendment, there are instances in which a plaintiff has alleged a claim against some defendants, but not others, or a plaintiff has not alleged a maritime tort at all, while others have. Consequently, it was necessary for this Court to de-cumulate the cases to address the allegations of each plaintiff against the applicable defendant(s). A consequence of the de-cumulation is that there are some plaintiffs who have not alleged a claim against Anadarko, and consequently, its insurer Aegis, whose policy contains an arbitration clause that is the basis for jurisdiction under 28 U.S.C. §1331 because of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §201, *et seq*. As to those claims, there must be an alternative basis for this Court to have subject matter jurisdiction.[8]

---

[8]    From a mechanical standpoint, the de-cumulation resulted in the pleadings being duplicated in each individual case, and therefore, Anadarko/Aegis are technically named as a party in each case. However, in some cases there are no allegations against Anadarko, and consequently, they would be entitled to dismissal as a matter of law thereby eliminating the jurisdictional basis that allowed for the removal to begin with. After much deliberation, in the interest of judicial efficiency, the undersigned believes that evaluating the claims from the standpoint of all defendants first allowed for ease of administration. Thus, it is still necessary to conduct the jurisdictional analysis.

In the Fifth Supplemental and Amending Complaint, the plaintiffs only alleged that "[t]his is a case of Admiralty and Maritime Jurisdiction arising under Article III, Section 2 of the United States Constitution, 28 U.S.C. § 1333 and F.R.C.P. Rule 9(h)."  [Rec. Doc. 280, p. 1]  While it is conceivable that subject matter jurisdiction based on diversity of citizenship may exist for some claims under 28 U.S.C. §1332 by virtue of the claims brought against the insurers under La. R.S. 22:1269, the plaintiffs have not pled that as a jurisdictional basis, and the pleadings do not support the conclusion that the parties are completely diverse or that the jurisdictional amount has been met.  Further, since all of the substantive state-law claims have been dismissed by final judgment, jurisdiction under 28 U.S.C. §1332, even assuming it were to exist because of the direct action claims, provides no relief to the plaintiffs because in order for the plaintiffs to recover from the insurers, their policyholders would have to be found liable for a maritime tort.  In order for a tort to be cognizable in admiralty against those policyholders, the same elements necessary for maritime jurisdiction must exist. *Grubart v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534 (1995); *Gulf Coast Shell & Aggregate Co. v. Newlin,* 623 F.3d 235, 239 (5th Cir. 2010).

The plaintiffs have not alleged any basis for federal question jurisdiction under 28 U.S.C. §1331. They have not alleged the applicability of the Admiralty

Extension Act, 46 U.S.C. §30101, nor have they alleged any facts, i.e. damages caused on land by a vessel (or defective appurtenance of a vessel) on navigable waters, to support jurisdiction under that statute.[9]

For those claims brought against defendants other than Anadarko and its insurer Aegis, for which subject matter jurisdiction may also exist under 28 U.S.C. §1331,  jurisdiction *must* exist under 28 U.S.C. §1333 in order for any of the plaintiffs to have a substantive claim of maritime tort.[10]

### Applicable Law and Discussion

A.    *The Rule 12(b)(6) Standard*

A motion to dismiss for failure to state a claim, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, is appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim.  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  When considering such a motion, a

---

[9]    *Dahlen v. Gulf Crews*, 281 F.3d 487, 493 (5th Cir. 2002) citing *Margin V. Sea-Land Services, Inc.* 812 F.2d 973, 975 (5th Cir. 1987); *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 455-56 (5th Cir. 1999). The undersigned notes the district court's reservation of this requirement after the decision in *Grubart*.  See *Apache Corp v. Global Santa Fe Drilling, Co.* 832 F. Supp 2d 678, 695 (W.D. La. 2010).

[10]    Notwithstanding the existence of federal question jurisdiction for Anadarko/Aegis, the plaintiffs must necessarily plead the elements for maritime jurisdiction to survive a 12(b)(6) motion arguing there is no maritime tort since the elements are the same for both.

district court must limit itself to the contents of the pleadings, including any attachments thereto. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). The court must accept all well-pleaded facts as true, and it must view them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotations omitted), quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196(5th Cir. 1996). Conclusory allegations and unwarranted deductions are not accepted as true, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. V. Twombly*, 550 U.S. 544, 555 (2007), quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

To survive a Rule 12(b)(6) motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 127 U.S. at 570. The plaintiff's obligation is "to provide the 'grounds' of his 'entitle[ment] to relief' [and] requires more than labels and conclusions." *Id.* at 555, citing *Papasan*, 478 U.S. at 286. The allegations must be sufficient to "raise a right to relief above the speculative level," and the pleading must contain something more than a statement of facts that creates merely a suspicion of a legally cognizable right of action. *Id.* at 555.

A claim meets the test for facial plausibility "when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The determination is context-specific, requiring the court to draw on its common sense and judicial experience.  In *Ashcroft*, the Supreme Court explained further:

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.  *Id*. at 679, 129 S.Ct. at 1950.

The Fifth Circuit explained the *Twombly* plausibility standard of pleading succinctly, as applied to Fed. R. Civ. P. 8(a)(2):

> The complaint(1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim.  "Asking for [such] plausible grounds to infer [the element of the claim] does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 257(5th Cir. 2009), quoting *Twombly*, 550 U.S. at 556.

Thus, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled.  Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts allow the court to reasonably infer that the defendant is liable for the misconduct alleged.  This analysis is not substantively different from that set forth in *Lormand, supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim.  The standard, under the specific language of Rule 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based.  The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under the particular theory of law provided there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of a claim."  *Lormand*, 565 F.3d at 257; *Twombly*, 550 U.S. at 556.

B.     *The Rule 12(b)(1) Standard*

As set forth above, the present procedural posture of this case necessarily requires a determination of the subject matter jurisdiction of the court although no

16

party has raised the issue by a motion under Fed. Rule Civ P. 12(b)(1).  The

standard for assessing whether a federal lawsuit, challenged under Rule 12(b)(1),

may continue or must be dismissed depends on the type of challenge posed.  In

considering facial challenges to federal subject matter jurisdiction, the court will

construe the complaint liberally, accepting all uncontroverted, well-pleaded

factual allegations as true, and viewing all reasonable inferences in the plaintiff's

favor.  *Spotts v. United States*, 613 F.3d 559, 566 (5th Cir. 2010).  A factual or

substantive attack on subject matter jurisdiction denies or controverts the

plaintiff's allegations of jurisdiction. In that analysis, the court will *not* presume

that plaintiff's factual allegations are true, but may instead accept affidavits and

other extrinsic evidence submitted by the parties to support their positions on

subject matter jurisdiction.  *Martin v. Halliburton*, 601 F.3d 381, 385 n.5 (5th Cir.

2010).  The court may also consider matters of public record.  In so doing, the

court may weigh the evidence before it and find the facts, so long as the fact-

finding does not involve the merits of the dispute.  See *Arbough v. Y&H Corp.*,

546 U.S. 500, 514 (2006).

Since there has been no evidence submitted, and since the parties have

consistently argued the pleadings as the basis for their positions under Rule

12(b)(6), this Court will look only to the allegations in the pleadings themselves

17

and to matters of public record to determine jurisdiction, recognizing that at some

point it is possible that factual evidence may be presented which might alter the

outcome reached in this report and recommendation.

C.    *Subject Matter Jurisdiction/Maritime Tort Under The General
Maritime Law*

Courts considering whether a plaintiff's claims sound in maritime tort apply

the same analysis used to determine admiralty jurisdiction:  situs or location and

status or connection with maritime activity.  *Grubart Inc. v. Great lakes Dredge

and Dock Co.*, 513 U.S. at 534.  The situs test is satisfied (1) if the alleged tort

occurred on navigable waters or (2) if the injury was suffered on land, if the

alleged tort was caused by a vessel on navigable waters.  *Id.*

In determining whether the tort occurred on navigable water, the Fifth

Circuit looks to "where the alleged wrong took effect rather than to the locus of

the allegedly tortious conduct."  *Egorov, Puchinsky, Afanasiev & Juring v.

Terriberry, Carroll & Yancey*, 183 F.3d at 456.

As to the requirement of navigable waters, "[j]urisdiction should be as readily ascertainable as courts can make it. If the waterway is capable of being used in commerce, that is a sufficient threshold to invoke admiralty jurisdiction." *Richardson v. Foremost Insurance, Co.* 641 F.2d 314, 316 (5th Cir. 1981), *affirmed* 459 U.S. 899 (1982). More recently, the Fifth Circuit, based on the Supreme Court decision of *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871), held that navigable waters of the United States are "those waters, capable in fact, of navigation in interstate travel or commerce." *Sanders v. Placid Oil Co.,* 861 F.2d 1374, 1377 (5th Cir. 1988).  Navigable waters of the United States are considered as such "when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States. . . ." *Id.[11]*

The status or "connection" test requires first, that the general features of the incident at issue, considered at "an intermediate level of possible generality" have the potential to disrupt maritime commerce, and second, that  "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart Inc. v. Great lakes Dredge and Dock*

---

[11]    See, also, *Meche v. Richard*, 2007 WL 634154 (W.D. La. 2007).

*Co.*, 513 U.S. at 534, 538-539, citing *Sisson v. Ruby*, 497 U.S. 358, 363-364, (1990); *Gulf Coast Shell & Aggregate Co. v. Newlin,* 623 Fd.3d at 239.

The *Grubart* court posed the relevant inquiry to determine if the general character of the activity shows a substantial relationship to traditional maritime activity  as "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand."  *Id.* at 539.  See also, *Strong v. BP Exploration & Production Co.*, 440 F.3d 665, 669 (5th Cir. 2006).  Further, *Grubart* instructs that the "substantial relationship" test is satisfied when at least one of the putative tortfeasors was engaged in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident at issue. *Grubart, 513 U.S.* at 541.

Given the procedural history of this case in state court, where state law claims were alleged, cumulation was accepted, and all the state law claims have since been dismissed by final judgment, this Court looks to the allegations of the most recent petition to determine whether the standards necessary for maritime jurisdiction to attach have been satisfied.

20

D.      *The Allegations in the Fifth Supplemental and Amending Petition*

The activities at issue in this case were originally described in the pleadings as the operation and maintenance of  pipelines, spoil banks, board roads, dredging activities, and various other oil and gas exploration over time by multiple defendants in association with oil and gas exploration/production.  [Rec. Doc. 1-7, p. 4] Based on these and other allegations, this Court found deficiencies in the plaintiffs' pleadings as to the required elements of a maritime tort, and consequently, maritime jurisdiction.  Since the cumulated claims in state district court included claims under state law, which have now been dismissed by final judgment, and potentially claims under general maritime law which were reserved in the state court ruling, this Court granted the plaintiffs leave to amend the complaint to plead with particularity facts sufficient "to determine where the specific injuries occurred to the specific plaintiffs, whether a vessel was involved, and whether the injurious activities occurred on land or water, by whom, and in what manner."  [Rec. Doc. 263, p. 11]  In the Fifth Supplemental and Amended Complaint, Plaintiffs have made that effort.

In Article 108, the plaintiffs allege:

As is set forth in more detail in connection with the specific facts of each Plaintiff's case, the incidents complained of herein giving rise to Plaintiff's damages are the result of the dredging of canals through

21

the navigable waters of the Atchafalaya Basin for the purpose of allowing drilling vessels to gain access to drilling and/or production sites.  In connection therewith, the creation of spoil banks and conducting other activities which obstructed commercial navigation and blocked the natural flow of water through the Buffalo Cove Area had both a real and potential disruptive impact on maritime commerce.[12]

The plaintiffs allege in general that beginning in the 1940's certain defendants began to explore for and/or produce oil and gas in the navigable waters of the Atchafalaya Basin in the Buffalo Cove Area, identified as three water management units which, absent the defendants' activities,  would be hydrologically connected "allowing for free and unfettered commercial navigation and water flows between and amongst same."[13]  The plaintiffs allege that the

---

[12]     [Rec. Doc. 280, p. 3.]  Article 109 is identical save the last clause which alleges the defendants' activities " had a substantial relationship with maritime commerce."

[13]     [Rec. Doc. 280, pp. 2-5.]  The Little Atchafalaya River or the Atchafalaya Basin Main Channel form a part of the perimeter of each unit and may be accessed by vessel from various bayous and other water bodies in these water management units.  "The Atchafalaya River is navigable and provides a significant industrial shipping channel for the state of Louisiana . . . The maintenance of the river as a navigable channel of the Mississippi River has been a significant project of the U.S. Army Corps of Engineers for over a century. . . . The river is formed near Simmesport at the confluence of the Red River with the Mississippi, where the Mississippi connects to the Red River by the 7-mile long canalized Old River. . . .  The Atchafalaya River meanders south as a channel of the Mississippi, through extensive levees and floodways past Morgan City, and empties into the Gulf (of Mexico) in Atchafalaya Bay approximately 15 miles south of Morgan City."  Wikipedia, *Atchafalaya River*, en.wikipedia.org/wiki/Atchafalaya_River, June 27, 2012.  The Gulf Intracoastal Waterway, "a navigable inland waterway running approximately 1700 kilometers (1050 mi) from Carrabelle, Florida to Brownsville, Texas . . .designed primarily for barge transportation," crosses the Atchafalaya River. Wikipedia, *Gulf Intracoastal Waterway*,en.wikipedia. org/wiki/ Gulf_ Intracoastal_Waterway, October 1, 2011.  The undersigned refers the district court to its well reasoned analysis of the navigability in fact of certain waters of the Atchafalaya Basin and how

Buffalo Cove Area "embodied several fishing areas," and that they, "as commercial fishermen who make their living by way of navigation upon the waters of the Buffalo Cove Area," have been damaged as result of the defendants' dredging of canals and concomitant creation of spoil banks, which obstructed commercial navigation, blocked the natural flow of water through the Buffalo Cove Area, obstructed or destroyed completely some of the navigable waterways and/or destroyed the health of the water upon which they relied for successful operation of their businesses, and/or destroyed the natural plant and animal life in the Buffalo Cove Area.[14]   The plaintiffs then assert in hundreds of articles, allegations specific as to particular defendants and particular plaintiffs.

###### E.      Whether the Defendants' Activities meet the Locality Test

Plaintiffs assert that all torts occurred on navigable waters or combined with torts occurring on navigable water.  As to most of the named defendants, the plaintiffs' allegations describe damage-causing *dredging* operations.  Dredges have been historically treated as vessels.  *Stewart v. Dutra Constr. Co.*, 543 U.S. 481 (2004) (discussing long standing precedent and Congressional intent in

---

vessels, such as those alleged in this case, utilized in crawfishing, supported the finding of commercial activity.  *Meche v. Richard*, 2007 WL 634154 (W.D. La. 2007).

[14]      [Rec. Doc. 280, pp. 2-4.]

finding a dredge to be a vessel under the statutory definition in the LHWCA).  Per the plaintiffs, the "nature of the dredging in question is such that this activity cannot but occur on navigable water, as it is an activity conducted by a vessel." [Rec. Doc. 353, p. 16]  The plaintiffs further argue that it makes no difference that the canals in question are navigable only for purposes of accessing oil production facilities and are not intended as "highways of commerce for commercial maritime traffic," citing to cases from the Fifth Circuit, including *McKie v. Diamond Marine*, 204 F.2d 132, 135(5th Cir. 1953), and *Dow Chemical Co. v. Dixie Carriers, Inc*., 463 F.2d 120(5th Cir. 1970), for the conclusion that for the admiralty jurisdictional analysis, even privately owned and used canals and slips can be considered navigable.  [Rec. Doc. 353, p. 19]

The pleadings allege that the following defendants (or their predecessor companies) engaged in such dredging activities, which led to conditions causing damage to the Buffalo Cove area and the individual plaintiffs: Hess Corporation f/k/a Amerada Hess Corporation [Para. 126-150, 156-157, 160, 162-168, 160, 162-168, 170-171, 173-174, 181, 183-184, 188, 192, 195, 202-205, 214, 217-218,220] ConocoPhillips [Para. 151-153, 169, 175, 177-178-180, 182, 185, 189-191, 199-201], Southern Natural Gas Company [Para. 154], Exxon Mobil Corporation [Para. 155, 158-159, 176, 213], Union Oil of California [Para. 155, 172], Florida

24

Gas Transmission Co. [Para. 161], The Dow Chemical Company [Para. 193-194], Anadarko Petroleum Corporation [Para. 206, 210-213], The Louisiana Land & Exploration Co. [Para. 207-209],  Kerr-McGee Federal Limited Partnership [Para. 224-225], Hunt Oil [Para. 219, 221, 229, 241, 243, 245], Denbury Management, Inc. [Para. 226-228, 230-232], and Hilcorp Energy [Para. 213, 234-235].

There are three entities who are named as defendants based on dredging activities of their "predecessors in interest" which occurred long ago, and ostensibly the current defendants continuing failure to remedy the impediments to navigation caused by those activities: El Paso Field Service Management, Inc. (whose predecessor is Sibon Pipeline Co.)  [Para. 155], Enterprise Products Co. (whose predecessor is Wanda Petroleum) [Para 187]and Texaco Pipelines LLC and/or Texaco Petrochemical Pipeline LLC (whose predecessor is unidentified) [ Para 186].

While the allegations against these entities seem to reflect nothing that would constitute traditional maritime activity or any activity by a vessel on navigable water during the time frame they were involved, the original "wrong" that was caused by their predecessor in interest does meet the test for maritime jurisdiction, and therefore, that wrong forms the basis for the maritime tort claim for which indemnity/contribution is sought from the successor.  As a consequence,

25

maritime jurisdiction attaches to the claim against the successor. *Sperry Rand Corp. v. Radio Corporation of America,* 618 F.2d 319, 321-322 (5th Cir. 1980).[15]

Accepting the allegations of dredging by these entities and the description of the areas in which they conducted their operations as true, and considering the prior extensive factual and scientific analysis by the district court involving the navigability of the Achafalaya Basin, including seasonal fluctuation and manmade impediments,  and the maritime commerce carried on there in the form of oil and gas exploration as well as fishing and hunting, this Court concludes that the *allegations* are sufficiently detailed to support the locality test as it applies to dredging operations conducted by dredges in the navigable waters of the Atchafalaya Basin.[16]


F.     *Whether the Defendants' Activities have a Substantial Relationship to Traditional Maritime Activity*

With regard to the second requirement necessary for admiralty jurisdiction to attach, the plaintiffs contend that the dredging of a navigable water body from a

---

[15]     The allegation of "predecessor in interest" is admittedly somewhat conclusory and this Court makes no finding as to the liability of these entities as successors in interest.

[16]     *Meche v. Richard*, 2007 WL 634154 (W.D. La. 2007).  This Court recognizes the defendants' arguments that some activities occurred on land, but having no evidence to determine the validity of that argument, this Court's findings and conclusions remain based on the allegations and matters of public record.

vessel is a traditional maritime activity. However, the fact that some oil and gas activities involve dredging does not automatically transform those activities into traditional maritime activities. *See In re Katrina Canal Breaches Litig.*, 324 Fed. App'x 370, 377 (5th Cir. 2007) (dredging by barge of canal "for flood-control, without more, does not satisfy the connection-to-maritime test."). Thus, it is not the fact of simply dredging by a vessel to which the court must look, but rather, per *Grubart*, the court must look to the "general character of Defendant's activity." *In re Katrina Canal Breaches Litigation,* 324 Fed. App'x at 379.

The status or "connection" test requires, first, that the general features of the incident at issue, considered at "an intermediate level of generality," must have the potential to disrupt maritime commerce. *Grubart*, 513 U.S. at 538-539. As alleged, one of the "general features" of dredging a canal for access to oil and gas exploration locations includes placing the spoil in areas of navigable waters so as to either completely block vessel access, impair vessel navigation, or so alter the water quality as to render it incapable of sustaining commercial crawfishing activity. This Court concludes that this element has been met with regard to dredging activities that completely close, obstruct access to, or destroy the quality of navigable waterbodies utilized by crawfishermen in their commercial vessels to

derive their source of livelihood. Accepting the allegations as true, this poses more than a "fanciful risk" to the plaintiffs' commercial interests. *Id.*

The second element requires the court to determine whether "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart,* 513 U.S. at 534, 539. This Court need look no further than the *Grubart* decision itself:

> We ask whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand. Navigation of boats in navigable waters clearly falls within the substantial relationship, *Foremost*, 457 U.S., at 675, 102 S.Ct., at 2658-2659; storing them at a marina on navigable waters is close enough, *Sisson*, supra, 497 U.S., at 367, 110 S.Ct., at 2898; whereas in flying an airplane over the water, *Executive Jet,* 409 U.S., at 270-271, 93 S.Ct., at 505-506, as in swimming, *id*., at 255-256, 93 S.Ct., at 498-499, the relationship is too attenuated.
>
> On like reasoning, the "activity giving rise to the incident" in this suit, *Sisson*, supra, 497 U.S., at 364, 110 S.Ct., at 2897, should be characterized as repair or maintenance work on a navigable waterway performed from a vessel. Described in this way, there is no question that the activity is substantially related to traditional maritime activity, for barges and similar vessels have traditionally been engaged in repair work sim to perform here.

*Grubart,* 513 U.S. 539-540.

The allegations in the pleadings reference two different types of dredging activity: dredging navigation access canals to the sites of wells and dredging

pipeline canals during pipeline construction.  It is reasonable to infer from the allegations that a vessel was used in both activities.  Thus, the general character of the activity is the dredging of navigation and pipeline canals from a vessel.  A necessary side effect of dredging a waterbody to a sufficient width/depth is that spoil is created, and the vessels (dredges) allegedly disposed of the spoil improperly so as to impact navigation and commerce.  Since the pleadings allege that the incidents giving rise to the plaintiffs' damages "are the result of the dredging of canals through the navigable waters of the Atchafalaya Basin for the purpose of allowing drilling vessels to gain access to drilling and/or production sites," [Rec. Doc. 280, para. 107-108] such activity would bear the requisite relationship to traditional maritime activity.  It is not the construction of pipelines that is the general nature of the activity, rather, it is the dredging of canals, the side effect of which impacted the very navigability of the waterways on which the activity was conducted.

This Court concludes that the dredging activity described in the pleadings as to the above-referenced defendants passes the connection test, since the pleadings describe closure, obstruction, and damage to navigable waterways in the Atchafalaya Basin/Buffalo Cove area by vessels on navigable waters and the potential to disrupt maritime commerce.  Further, the general features of the

29

activity described involve the creation of canals by dredges, recognized to be vessels for purpose of the "traditional maritime activity" analysis.  On these allegations, the undersigned concludes that admiralty jurisdiction is established as to the above-named defendants.

As to other defendants named in the pleadings, the term "dredging" is not used at all in describing their tortious actions, with the more general descriptions of pipeline construction and maintenance, acquisition of interests in and/or purchase of existing pipelines, "trenching" for pipelines, failing to maintain pipelines, leveling pipeline spoil banks with bulldozers, placing cement mats on pipeline sections, and other general allegations of wrongful acts or omissions "on information and belief."  Pipeline construction and repair, even when it involves services from vessels and by divers, has been found to be "not traditionally maritime." *Union Texas Petroleum v. PLT Engineering*, 895 F.2d 1043, 1049 (5th Cir. 1990) (a case interpreting applicability of the Louisiana Oil, Gas and Water Well Lien Act); *Sea Robin Pipeline Co. v. Red Sea Group, LTD*, 919 F.Supp. 991, 996(W.D. La. 1996) (finding pipeline construction and repair to be related to oil and gas exploration, not maritime commerce).

This Court concludes that the general features of these activities, as described, are related to oil and gas exploration and production, rather than

maritime commerce.  On that basis, although the claims against these defendants

may be within the supplemental jurisdiction of the court if they are in combination

with other alleged tortfeasors, i.e. Anadarko/Aegis,  the individual activities as

described cannot form the basis for maritime tort claims – the only tort claims

available to the plaintiffs in this case.[17]

The allegations in the pleadings against the following defendants fall into

that category:  Concha Chemical Pipeline LLC [Para. 215] (purchased existing

pipeline and failed to maintain according to permits "on information and belief"),

Enterprise Lou-Tex Propylene Pipeline, L.P. [Para. 242] (purchased existing

pipeline and failed to maintain according to permits "on information and belief"),

Bridgeline Holdings, LLC [Para. 216] (acquired interest in existing pipeline and

failed to properly maintain according to permits "on information and belief"),

Shell Pipeline Company LP [Para. 196-198] (constructed a pipeline on the same

right of way as a prior pipeline, violating permits "on information and belief"),

Sorrento Pipeline Company and Wilbros RPI, Inc. [Para. 236-240] (permitted to

construct a pipeline in same right of way as existing pipeline compounding

---

[17]      Were the court to find the claims against these defendants not viable due to the basis of
lack of subject matter jurisdiction, remand to state court would be appropriate. 28 U.S.C.
§1447(c) even though there are no state law claims that can be addressed by the state district
court, as all have been dismissed by final judgment.  However, as to each plaintiff's claim against
each of these defendants, there is a basis for supplemental jurisdiction, and therefore, dismissal
with prejudice under Rule 12(b)(6) is appropriate.

previous obstructions and leveling spoil banks with bulldozers, plugging natural drains "on information and belief"), Denbury Resources, Inc. and Denbury Energy Services, Inc. [Para. 161, 233] (purchased/acquired Florida Gas pipelines and failed to honor permit requirements "on information and belief"),  and Dow Intrastate Gas Company [Para.244] (permitted to place cement mats on exposed sections of existing pipeline, impeding navigation "on information and belief"). Finally, the Court notes that Defendants Campbell Energy Corporation, Gulf Production Company, Inc., and Pano-Tech Exploration Corp, a/k/a Capricorn Pipeline Co. are not referenced at all in the Fifth Supplemental and Amending Complaint, and there are no allegations in the prior pleadings to support maritime tort claims against them.

The activities described as to these defendants – including oil/gas exploration, pipeline construction/maintenance, and simply ownership of pipelines – fall short of any connection to traditional maritime activity.  On this basis, this Court concludes that the plaintiffs cannot state viable maritime torts against these defendants, and since there are no other claims available to the plaintiffs at this stage of the litigation, the motions to dismiss as to the above-named defendants should be granted, for the plaintiffs' failure to state a cause of action for which relief could be granted.

Likewise, there are a number of insurers against whom relief is sought, pursuant to the Louisiana Direct Action Statute, for the liability of the defendants for whom this Court concludes there is no cause of action. It is axiomatic that an insurer's liability is premised upon a finding that the insured is liable.  Since the court finds that there is no cause of action for which relief could be granted as to the above-named defendant insureds, then their respective insurers can have no liability and cannot be cast in judgment for the liabilities of those insureds.  Those insurers[18] are: Associated Electric & Gas Insurance Services Limited (for Bridgeline Holdings, L.P.), Zurich American Insurance Company and AIG (for Shell Pipeline Company LLP), American Equity Insurance Company, Steadfast Insurance Company, Liberty Mutual Insurance Company, Americas Insurance Company, TIG Specialty Insurance Company, St. Paul Surplus Lines Insurance Company, and General Security Indemnity Company of Arizona (formerly Fulcrum Insurance Company) (for Denbury Resources, Inc.), AIG (for Sorrento Pipeline Company), and Underwriters at Lloyd's London, Lloyds Underwriters, Lloyds and Companies and/or Lloyds of London (for Gulf Production Company,

---

[18]For some defendants, the pleadings identify the applicable insurers by fictitious, alphabetical names only, e.g. DEF Insurance Company.  Such identifiers are used for the alleged insurers of Concha Chemical Pipeline, L.L.C. (DEF Insurance Company), Enterprise Lou-Tex Propylene Pipeline L.P. (MNO Insurance Company), Wilbros RPI, Inc. (JKL Insurance Company).  As to Defendants Denbury Energy Service, Inc. , Campbell Energy Corporation, Pano-Tech Exploration Corp. and Dow Intrastate Gas Company, no insurance providers are named.

33

Inc.).  However, some of these insurers will remain parties as insurers of other defendants who are not dismissed by this ruling.

### *Recommendations*

On these findings, it is the recommendation of the undersigned that the blanket motions to dismiss by defendants Hess Corporation f/k/a Amerada Hess Corporation, ConocoPhillips, Southern Natural Gas Company, Exxon Mobil Corporation, El Paso Field Services Management Inc., Enterprise Products Company, Union Oil of California, Florida Gas Transmission Co., The Dow Chemical Company, Texaco Pipelines, LLC, Anadarko Petroleum Corportaion, Hunt Oil,  Denbury Management, Inc., Hilcorp Energy, The Louisiana Land & Exploration Co., and Kerr-McGee Federal Limited Partnership be DENIED on the basis that the plaintiffs have alleged a maritime tort, however, that further ruling on the motions by these parties be DEFERRED to be considered in the separate rulings relative to the claims of individual plaintiffs.

It is the recommendation of the undersigned that the motions to dismiss should be GRANTED as to Concha Chemical Pipeline, Enterprise Lou-Tex Propylene Pipeline, L.P., Bridgeline Holdings, Shell Pipeline Company, Sorrento Pipeline Company, Wilbros RPI, Inc, Denbury Resources, Inc., Denbury Energy Services, Inc., Dow Intrastate Gas Company, Campbell Energy Corporation, Gulf

34

Production Inc., and Pano-Tech Exploration Corp. since maritime torts cannot be established by any plaintiff as to these defendants.

The motions should likewise be GRANTED as the the insurers of these defendants, including Associated Electric & Gas Insurance Services Limited (for Bridgeline Holdings, L.P.), Zurich American Insurance Company and AIG (for Shell Pipeline Company LLP), American Equity Insurance Company, Steadfast Insurance Company, Liberty Mutual Insurance Company, Americas Insurance Company, TIG Specialty Insurance Company, St. Paul Surplus Lines Insurance Company, and General Security Indemnity Company of Arizona (formerly Fulcrum Insurance Company) (for Denbury Resources, Inc.), AIG (for Sorrento Pipeline Company), and Underwriters at Lloyd's London, Lloyds Underwriters, Lloyds and Companies and/or Lloyds of London (for Gulf Production Company, Inc.).

Under the provisions of 28 U.S.C. Section § 636(b)(1)(C) and Fed. R. Civ. P. Rule 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or responses to the district judge at the time of filing.

35

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this report and recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed at Lafayette, Louisiana, this 1st day of August, 2012.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

36