# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

**LOUISIANA CRAWFISH PRODUCERS**          **\*CIVIL NO. 6:10-0348**
 **ASSOCIATION - WEST, ET AL.**

**VERSUS**                               **\*JUDGE DOHERTY**

**AMERADA HESS CORP., ET AL.**           **\*MAGISTRATE JUDGE HILL**

### *to be filed in all related cases

## REPORT  AND  RECOMMENDATION

Pending before the undersigned for report and recommendation is the Motion for

Summary Judgment filed by defendants,  Southern Natural Gas Company ("SNG"), The

Dow Chemical Company ("Dow") and Florida Gas Transmission Company ("Florida

Gas"), collectively, "the defendants."  [rec. doc. 546].  The Motion has been adopted by

Associated Electric and Gas Insurance Services Limited ("AEGIS").[1] [rec. doc. 562].

The plaintiffs have filed Opposition [rec. doc. 576], to which the defendants have filed

_____

[1]AEGIS is the alleged insurer of SNG. [*See* rec. doc. 1-7, pgs. 25-26 and 36-37].  The Court notes that other alleged insurers of SNG have not filed formal motions to adopt the motion for summary judgment. Specifically, the following insurers have not formally adopted the instant Motion: Century Indemnity Company, as successor to CCI Insurance Company of North America and Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, f/k/a California Union Insurance Company; St. Paul Fire and Marine Insurance Company; Certain Underwriters at Lloyd's London; and Zurich Insurance Company. Further, pursuant to this Court's order of September 16, 2010, "all Insurer defendants shall be deemed to have adopted any generally applicable dispositive motion filed by any other Insurer Defendant." [rec. docs. 226, 227] Since AEGIS adopted the motion, this Court will construe that adoption be deemed to apply to the other insurers absent opt out notice.

1

a Reply [rec. doc. 580]. Oral argument on the Motion was held on October 27, 2015 and the Motion was taken under advisement

For the reasons which follow, it is recommended that the Motion for Summary Judgment be **denied** as the defendants are not entitled to judgment as a matter of law.

## Factual and Procedural Background

Plaintiffs allege they are commercial crawfishermen, who are all members of the Louisiana Crawfish Producers Association-West, and who fish(ed) the Atchafalaya Basin waters to harvest crawfish.  In their original petition, they alleged that since the mid-1980's, the non-insurer defendants' activities in building/operating pipelines and oil and gas access canals included the construction and maintenance of artificial dams with spoil and dredge material that blocked the natural flow of water in the "Buffalo Cove Area."[2]  The canals and associated barriers, together with the discharge of pollutants and spoil/dredge material, are alleged to have impacted the quality of the water to the point that oxygen levels were severely reduced causing the crawfish harvest to be adversely affected or eliminated.[3]  As a result, the plaintiffs alleged that

---

[2] rec. doc. 1-6 ,p. 4-6; rec. doc. 1-7, p. 4-5.  The Buffalo Cove Area includes three individual water management units initially identified in plaintiffs' Third Supplemental and Amending Petition [rec. doc. 1-7, p. 4-5], and re-identified in Article 111 of the Fifth Supplemental and Amending Petition [rec. doc. 280, p. 4-5].

[3] rec. doc. 1-6 p. 6.

2

they have suffered economic losses, among other items of damages, because the

Buffalo Cove Area is no longer a viable location for commercial crawfishing.

In the plaintiffs' original Petition and First Supplemental and Amending Petition,

they sought relief under Louisiana tort law and the general maritime law.[4]  In so doing,

the plaintiffs expressly and specifically alleged that they "do not seek remedies under

any specific Federal Statute or Federal Regulation whatsoever."[5]

Prior to removal, the claims of the plaintiffs brought under state law were

dismissed pursuant to an exception of no cause of action based on *Robins Dry Dock &*

*Repair v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927); however, the state

district court expressly recognized that the plaintiffs' claims under maritime law were

reserved.[6]  The decision dismissing the state law claims, which is now final, was

affirmed by the Louisiana Third Circuit Court of Appeal, stated in pertinent part:

> The trial court's dismissal of Plaintiffs' state law claims is based on the
> rule of *Robins Dry Dock & Repair v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72
> L.Ed. 290 (1927) which, broadly stated, operates to deny a plaintiff
> recovery for economic loss resulting from physical damage to property in
> which he has no proprietary interest. . . .   In this appeal, plaintiffs argue

---

[4]rec. doc. 1-6, p. 7-10 and 20.  In their original Petition, the plaintiffs sought relief exclusively under Louisiana tort law. [rec. doc. 1-6, pg. 9, ¶22].  Paragraph 22 was amended to seek relief under the general maritime law.

[5]rec. doc. 1-6, pg. 20,  ¶22; *see also* rec. doc. 1-6, pg. 9, ¶22.

[6] *See* rec. doc. 162-2.

that they fall within the exception to *Robins* afforded to commercial fisherman, as recognized in the federal district court ruling of *Louisiana ex rel. Guste v. M/V TESTBANK,* 524 F. Supp. 1170 (E.D. La. 1981), and in *Union Oil Co. v. Oppen*, 501 F.2d 558 (9th Cir. 1974).  Plaintiffs also rely upon two other federal district court cases in which, they contend, other similarly-situated claimants have recovered economic damages under state tort law.  *See Shaughnessy v. PPG Indus., Inc*., 795 F.Supp. 193 (W.D.La. 1992) and *Maddox v. Int'l Paper Co.,* 47 F.Supp 829 (W.D.La. 1942).  Defendants respond that *Shaughnessy* and *Maddox* are distinguishable, in that those plaintiffs were riparian landowners as well, and that the one Louisiana state court case to address this issue, *Dempster v. Louis Eymard Towing Co., Inc.,* 503 So.2d 1136 (La. 1987), held that fisherman did not have a cause of action for economic loss arising from the destruction of a fishing site. After reviewing the above jurisprudence, and the many other cases cited by both sides to this controversy, we find Defendants' arguments to be persuasive

* * *

[W]e find that the trial court properly granted Defendants' exception of no cause of action as to Plaintiffs' state law claims.

*Louisiana Crawfish Producers Association-West v. Amerada Hess Corporation*, 2005-1156 (La. App. 3 Cir. 7/12/06), 935 So.2d 380, 382-383, 385, *writ denied*, 2006-2301 (La.12/8/06), 943 So.2d 1094.

Thereafter, the defendants filed peremptory exceptions of no cause and no right of action seeking dismissal of the plaintiffs' federal maritime claims, arguing essentially the same grounds asserted in their prior successful exception on plaintiffs' Louisiana state law claims.  On October 13, 2006, the Sixteenth Judicial District Court denied these exceptions, primarily relying on the Louisiana Third Circuit Court of Appeals

decision in *Poe v. PPG Industries*[7], which applied federal maritime law to allow commercial fishermen, who asserted negligent and intentional maritime tort claims for compensatory damages for loss of livelihood after their fishing area was polluted by the defendants' conduct, to seek punitive damages from the defendants.  In so doing, the Third Circuit found "tacit recognition [in *Poe*] of the rights of commercial fisherman to seek damages despite the ruling of *Robins Dry Dock*."[8]  The court reasoned that "[i]t is axiomatic that punitive damages are allowed only in cases where general or special damages are allowed in an underlying claim. . . [t]herefore, the recognition of the right of fishermen . . . to seek punitive damages in *Poe*,  necessarily carried with it the right . . . to seek . . . general damages as well."[9]   The defendants' requests for supervisory writs were denied by the Louisiana Third Circuit Court of Appeal and the Louisiana Supreme Court.[10]

---

[7] 782 So.2d 1168 (La. App. 3rd Cir. 2001), *writ denied*, 794 So.2d 801 (2001).

[8]rec. doc. 563-26, pg. 46-50.

[9]rec. doc. 563-26, pg. 50.

[10]*See e.g.*  rec. doc. 563-28, pg. 250-253 and 258-261, *Louisiana Crawfish Producers Association - West v. Amerada Hess Corp*, CW-06-1645 (La. App. 3rd Cri. 2/8/2007) (Florida Gas writ application)  and *Louisiana Crawfish Producers Association - West v. Amerada Hess Corp*, CW-06-1645 (La. App. 3rd Cri. 2/8/2007) CW-06-1628 (La. App. 3rd Cri. 2/8/2007) (Dow writ application); *Louisiana Crawfish Producers Association - West v. Amerada Hess Corp.*, 955 So.2d 696 (La. 4/27/2007) (Florida Gas writ application).

5

As a result of these decisions and the denials of writs by the Louisiana Supreme Court, all that remained pending in the state-court litigation at the time of removal were claims brought under the general maritime law.[11]

On March 1, 2010, the case was removed to this court by AEGIS,  as the alleged insurer of then defendant Anadarko Petroleum Corp.[12], with the written consent of all other remaining defendants who had been properly served as of the removal date.[13] [rec. docs. 1 and 1-2].

Beginning July 30, 2010, the defendants filed multiple motions for summary judgment seeking dismissal of the plaintiffs' remaining claims on the basis that maritime law does not provide a remedy to the plaintiffs because of the prohibition of "group or enterprise" liability under maritime law.  [rec. doc. 162].[14]  This Court recommended that the motions be granted to the extent that the plaintiffs cannot

---

[11]This Court notes that there were also claims brought against various liability insurers of the defendants under Louisiana's Direct Statute, La. R.S. 22:1269, that were alleged in the plaintiffs' Fourth Supplemental and Amending Petition filed in state court. [rec. doc. 1-7 pp. 19-48].

[12]AEGIS is alleged to have insured several other defendants, including SNG. [*See* rec. doc. 1-7, pg. 25-26 and 36-37].

[13]Subject matter jurisdiction supporting removal was based on 28 U.S.C. §1331 as an action falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201, *et seq.* No party challenged the removal of the action but the undersigned ordered briefing on the jurisdictional issue.  After considering the briefs, the undersigned found the court had subject matter jurisdiction and that the case had been properly removed. [rec. doc. 140].

[14]This motion was adopted by all the defendants pursuant to the Case Management Order. [rec. docs. 226-2 and 227].

6

establish causation through such theory.  [rec. doc . 263, p. 18]. However, because the

claims had been cumulated under state law, and because there had never been any effort

to allege specific claims, by specific plaintiffs, against specific defendants, that would

sound in maritime tort, the undersigned also recommended:

> that the plaintiffs be given leave to amend their petition, pursuant to Fed.
> Rule Civ. P. 56(e), to allege a specific harm, to a specific plaintiff(s),
> caused by the conduct of a specific defendant(s), with sufficient factual
> detail to establish a maritime tort for each, within the parameters of Fed.
> Rule Civ. P. 8 as interpreted by *Bell Atlantic v. Twombly*, 550 U.S. 544
> (2007), and *Ashcroft v. Iqbal*, ----U.S.----, 129 S.Ct. 1937 (2009). [rec. doc.
> 263, p. 18].

The recommendations were adopted by the district court on March 16, 2011. [rec.

doc. 269].

The defendants also filed motions for summary judgment seeking dismissal of

the plaintiffs' claims under the rule of *Robins Dry Dock & Repair v. Flint*, 275 U.S. 303

(1927), because none of the plaintiffs could allegedly demonstrate economic losses

caused by damage to anything in which they have a proprietary interest.  [rec. doc.

191].[15]  In response to the motions, the plaintiffs argued that as commercial fishermen,

they should be excepted from application of the *Robins Dry Dock* rule, to which the

defendants replied that the exception either does not exist or does not apply in the

---

[15]This motion was likewise adopted by all the defendants pursuant to the Case Management Order. [rec.
doc. 226-2 and 227].

instant case.  Until the complaint was amended and the allegations were evaluated to determine if a maritime tort existed for each plaintiff, against any or all of the defendants, determination of the issue of whether the rule of *Robins Dry Dock* applied was premature.  As a consequence, this Court recommended that those motions be denied as premature, without prejudice to the rights of the defendants to raise the issue again should it become necessary. [rec. doc. 336].  The recommendation was adopted by the district court on August 23, 2011.  [rec. doc. 344].

On May 16, 2011, in response to the Court's order, the plaintiffs filed a Fifth Supplemental and Amended Complaint, a pleading consisting of 174 pages and more than 413 paragraphs.  [rec. doc. 280].  The activities at issue were originally described in the prior pleadings as the operation and maintenance of  pipelines, spoil banks, board roads, dredging activities, and various other oil and gas exploration over time by multiple defendants in association with oil and gas exploration/production.  [*See* rec. doc. 1-7, p. 4]. In Article 108 of their Fifth Supplemental and Amended Complaint, however, the plaintiffs allege:

> As is set forth in more detail in connection with the specific facts of each Plaintiff's case, the incidents complained of herein giving rise to Plaintiff's damages are the result of the dredging of canals through the navigable waters of the Atchafalaya Basin for the purpose of allowing drilling vessels to gain access to drilling and/or production sites.  In connection therewith, the creation of spoil banks and conducting other activities which obstructed commercial navigation and blocked the natural flow of water

through the Buffalo Cove Area had both a real and potential disruptive impact on maritime commerce.[16]

The plaintiffs further allege that beginning in the 1940's certain defendants began to explore for and/or produce oil and gas in the navigable waters of the Atchafalaya Basin in the Buffalo Cove Area, identified as three water management units which, absent the defendants' activities,  would be hydrologically connected "allowing for free and unfettered commercial navigation and water flows between and amongst same."[17] The plaintiffs allege that the Buffalo Cove Area "embodied several fishing areas," and that they, "as commercial fishermen who make their living by way of navigation upon the waters of the Buffalo Cove Area," have been damaged as result of the defendants' dredging of canals and concomitant creation of spoil banks, which obstructed commercial navigation, blocked the natural flow of water through the Buffalo Cove Area, obstructed or destroyed completely some of the navigable waterways and/or destroyed the health of the water upon which they relied for successful operation of

---

[16]rec. doc. 280, p. 3.  Article 109 is identical save the last clause which alleges the defendants' activities " had a substantial relationship with maritime commerce."

[17]rec. doc. 280, pgs. 2-6.  The undersigned refers the district court to its well reasoned analysis of the navigability in fact of certain waters of the Atchafalaya Basin and how vessels, such as those alleged in this case, utilized in crawfishing, supported the finding of commercial activity.  *Meche v. Richard*, 2007 WL 634154 (W.D. La. 2007).

9

their businesses, and/or destroyed the natural plant and animal life in the Buffalo Cove Area.[18]

The plaintiffs  further allege that certain defendants were required to obtain permits from the United States Army Corps of Engineers, which imposed certain requirements on these defendants' operations that were designed to insure the natural flow of water through the Buffalo Cove Area and that the natural environment not be adversely impacted.  These permits additionally prohibited the interference or obstruction of commercial navigation within the Buffalo Cove Area.[19]  The plaintiffs allege that the defendants negligently or intentionally conducted their operations in violation of these permits, thereby causing the plaintiffs' damages.[20]

The plaintiffs then assert, in hundreds of paragraphs, allegations specific as to particular defendants and particular plaintiffs.  With respect to damages, the plaintiffs uniformly claim loss of their livelihood (e.g. lost earnings, loss of earning capacity, lost catches and lost ability to catch wildlife, lost income and lost profits), as well as "natural resource damages", loss of access to the Atchafalaya Basin and loss of

---

[18]rec. doc. 280, pp. 2-4.

[19]rec. doc. 280, pg. 2-3, ¶ 103.

[20]rec. doc. 280, pg. 2-3, ¶ 105; *see also* pgs. 22-23, ¶ 154 (regarding the liability of SNG), pg. 27-28, ¶ 161 (regarding the liability of Florida Gas) and pg. 45-46, ¶ 193 (regarding the liability of Dow).

10

navigation. They additionally claim unspecified property damages, including damages for the death of crawfish while in traps, the costs of repair and replacement [of traps], and the cost of additional traps.[21]

In response, the defendants collectively filed motions to dismiss pursuant to Rule 12(b)(6), arguing that despite amendment, the plaintiffs had nevertheless failed to state a cause of action for maritime tort. [rec. docs. 328-333, 340]. This Court heard lengthy oral arguments from the parties on October 25, 2011. [rec. doc. 406]. Prior to issuance of a Report and Recommendation, the claims of each plaintiff were separated into individual related cases. [rec. doc. 366].

Thereafter on August 1, 2012, a Report and Recommendation was issued in which this Court concluded that the plaintiffs had stated a maritime tort cause of action against those defendants (and their predecessor companies) who are alleged to have engaged in dredging activities, which led to conditions causing damage to the Buffalo Cove area where the plaintiffs claimed to have previously fished. Those defendants included SNG, Florida Gas and Dow. The Court additionally concluded that the plaintiffs had failed to state a maritime tort cause of action against those defendants (and their insurers) who are alleged to have engaged in non-traditional maritime activities including: pipeline construction and maintenance, acquisition of interests in

---

[21]*See e.g.* rec. doc. 280, pg. 77, ¶ 248.

and/or purchase of existing pipelines, "trenching" for pipelines, failing to maintain pipelines, leveling pipeline spoil banks with bulldozers, placing cement mats on pipeline sections. [rec. doc. 379].

The district court adopted the recommendations with  modifications on January 18, 2013. [rec. docs. 416 and 417].  The district court declined to revisit the issues and denied relief on plaintiffs' motion for reconsideration.[22] [rec. doc. 424 and 425].  Although that decision was affirmed on appeal, the defendants' have filed a second motion for reconsideration which is pending before the district court. [rec. docs. 548 and 549].

In the interim, following a settlement conference with the undersigned, all defendants except Dow, Florida Gas, SNG and its insurers settled.[23] [rec. doc. 444].  These defendants have now filed the instant Motion for Summary Judgment, seeking dismissal of the plaintiffs' maritime tort claims based on alleged displacement by the Clean Water Act ("CWA").

_____

[22] Several appeals were taken. [*See e.g.*  rec. doc. 427].  However, with the majority of those appeals were dismissed after a  settlement agreement was reached. [*See* rec. doc. 463 and 489].

[23] Two other defendants, Dow Intrastate Gas Company and Willbros RPI, Inc. also did not participate in the settlement.  However, these defendants were amongst those dismissed on Motion to Dismiss for the plaintiffs failure to state a claim against them.  This Court's ruling was affirmed by the Fifth Circuit on appeal.  *In Re Louisiana Crawfish Producers*, 772 F.3d 1026 (5th Cir. 2014).  Thus, they are no longer parties defendant in this litigation.

In their motion, the defendants argue that the plaintiffs' maritime tort claims have been displaced because the CWA creates a comprehensive scheme for regulation of discharges of dredged spoil and the creation of spoil banks which "speaks directly" to the plaintiffs' damage claims, which the defendants assert are based entirely on alleged violations of permits issued to them by the U.S. Army Corps of Engineers. Therefore, they assert that the statutory scheme of the CWA wholly displaces and supersedes the plaintiffs' claim for damages.

The defendants  additionally argue that plaintiffs do not have a claim for obstruction to navigation under either the federal common law or the 1899 Rivers and Harbors Act ("RHA").  More specifically, the defendants argue that under *Willamette Iron-Bridge Co v. Hatch*, 125 U.S. 1 (1888) there is no federal common law right of action for obstructions to navigation and that under *California v. Sierra Club,* 451 U.lS. 287 (1981) there is no private right of action under § 10 of the RHA

In opposition, the plaintiffs argue that their claims are not premised under, nor do they seek  relief under, the CWA or the RHA.  The plaintiffs contend that they have not made claims for abatement, remediation, injunctive relief or public nuisance, to which the CWA may "speak".  Rather, plaintiffs' assert that their claims are for negligent and intentional maritime tort, for which they seek damages to compensate them for their loss of livelihood as a result of the defendants' alleged tortious conduct.  In short, the

13

plaintiffs assert that they set forth private maritime tort claims for economic injury. They argue that there is nothing in the CWA which indicates a Congressional intent to displace their general maritime law tort claims for damages, and that their claims do not conflict or interfere with the federal regulatory goals of CWA.  Therefore, their damage claims do not fall within the ambit of the CWA, and the CWA does not "speak to" the conduct in question.

The plaintiffs further argue that the defendants' permit violations are not cited in their Complaints to state a remedy, or to seek relief under, the CWA. To the contrary, plaintiffs assert that their allegations of the permit requirements and the alleged violations merely define proscribed conduct, the breach of which proves two elements of a maritime negligence claim - the duty owed by the defendants and breach of that duty.  Stated differently, the plaintiffs assert that the permits are cited to assist in defining the applicable standard of care under a maritime negligence analysis.

With respect to the RHA, the plaintiffs concede that there is no private right of action to prevent obstructions to navigation.  However, as is the case with the CWA, the plaintiffs assert that they seek no remedy or relief under the RHA.

## Law and Analysis

### I. Standard on Motion for Summary Judgment

"A summary judgment motion is properly granted only when, viewing the evidence in the light most favorable to the nonmoving party, the record indicates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Am. Home Assurance Co. v. United Space Alliance, LLC*, 378 F.3d 482, 486 (5th Cir. 2004); Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Thorson v. Epps,* 701 F.3d 444, 445 (5th Cir. 2012); *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000) *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence in the record is considered in a light most favorable to the non-moving party and all reasonable inferences are drawn in favor of the non-moving party. *Id.; First Am. Bank v. First Am. Transp. Title Ins. Co.*, 585 F.3d 833, 837 (5th Cir.2009) *citing Robinson v. Orient Marine Co., Ltd.*, 505 F.3d 364, 366 (5th Cir. 2007); *See also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).

**Displacement under the CWA**

It is a longstanding is the principle that "[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *United States v. Texas*, 507 U.S. 529, 534, 113 S.Ct. 1631, 1634 (1993) *quoting Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952) and *Astoria Federal Savings & Loan Assn. v. Solimino*, 501 U.S. 104, 108, 111 S.Ct. 2166, 2169–2170, 115 L.Ed.2d 96 (1991).[24]  "In such cases, Congress does not write upon a clean slate." *Id. citing  Astoria*, 501 U.S. at 108, 111 S.Ct., at 2169–2170.   Congress need not "affirmatively proscribe" the common-law doctrine at issue to evince this intent.  *Id. citing Milwaukee v. Illinois* , 451 U.S. 304, 315, 101 S.Ct 1784, 1791, 68 L.Ed.2d 114 (1981).  Rather, "in order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law."  *Id. quoting Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 2015 (1978) and

---

[24]The *Texas* Court rejected an argument that the presumption favoring retention of existing common law only applies "with respect to state common law or federal maritime law." *Id.* at 534, 113 S.Ct. 1631. In so doing, the Court noted that "[a]lthough a different standard applies when analyzing the effect of federal legislation on state law, there is no support [in Supreme Court] cases for the proposition that the presumption has no application to federal common law, or for a distinction between general federal common law and federal maritime law. . . ." *Id. See also* Singer, Norman & Singer, J.D., 2B Statutes and Statutory Construction § 50:1 (7th ed. 2007) ("All legislation is interpreted in light of the common law and the scheme of jurisprudence existing at the time of its enactment.").

*Milwaukee*, 451 U.S. at 315, 101 S.Ct. at 1791; *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489, 128 S.Ct. 2605, 2619 (2008) *quoting United States v.Texas, supra.*

The defendants argue that because the CWA does not provide for compensatory damages and does provide a comprehensive remedial scheme, compensatory damages should be deemed displaced.[25]   The CWA is a comprehensive statutory regime designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To that end, the CWA  provides a carefully calibrated set of civil (and criminal) penalties for violations of conditions or limitations set forth in the CWA and for violations of permits issued under the CWA.  The defendants' argument is essentially that this carefully graduated and limited set of liabilities, by implication, precludes a compensatory damage award in this case.  In support of this inference, the defendants cite the Supreme Court decisions in *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615 (1981) (*Sea Clammers*) and  *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 101 S.Ct. 1784 (1981) (*Milwaukee*), both of which involved remedies in nuisance actions for the release of pollutants into the public waterways.

---

[25]Cases use the terms "preempted" and "displaced" interchangeably.  For the sake of uniformity, the undersigned will use the term "displaced".

In *Sea Clammers*, plaintiffs claimed that the EPA and Army Corps of Engineers had permitted discharge of sewage into New York Harbor and the Hudson beyond what the statutes allowed, and that the permittees had violated their permits. *Sea Clammers*, 453 U.S. at 12. The Court was concerned with the availability of a damages remedy based on either the federal common law of nuisance or the provisions of the CWA or the Marine Protection, Research, and Sanctuaries Act ("MPRSA"). *Id.,* 453 U.S. at 4. The Court, in pertinent part, considered "whether all federal common-law nuisance actions concerning ocean pollution now are pre-empted by the legislative scheme contained in the [CWA] . . . and, . . . if not, whether a private citizen has standing to sue for damages under the federal common law of nuisance." *Id*., 453 U.S. at 11. The Court held that the CWA and MPRSA provided a carefully structured set of citizens' remedies, but not the private action for monetary and injunctive relief sought in the case, so Congress must not have meant to provide for this additional remedy. *Id*., 453 U.S. at 14-18. Therefore, a common law nuisance remedy was precluded.

The Court also found a federal common law nuisance action to be displaced by the CWA, following *Milwaukee, supra. Sea Clammers*, 453 U.S. at 21-22. *Milwaukee* held that a federal district court could not, under the federal common law of nuisance, impose and enforce more stringent effluent limitations than those established by the administrative agency charged with enforcement of the CWA, so for purposes of a

claim seeking that relief, the CWA displaced the common law nuisance remedy. *Milwaukee*, 451 U.S. at 319-323.  Similarly, in *Sea Clammers*, the administrative agency decided to subordinate to some degree the interest in protecting shellfish and bottomfish to the interest in allowing a city to dispose of its sewage, and the district court was not allowed to change that balance and allow bottomfish protection to trump safe disposal of sewage.

Though the question is not without doubt in light of these precedents, for the reasons which follow, this Court concludes that the CWA does not preclude private negligent and intentional maritime tort claims for compensatory damages for economic injury to the livelihood of private individuals.

The CWA, like other environmental statutes, contains citizen suit provisions which essentially empower a citizen to act as a private attorney general to enforce the provisions of the statute where the government has not done so. Section 1365(e) of the citizen's suit provisions in the CWA expressly provides that it does not displace common law rights to other relief:

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief . . . .

19

While this savings clause was held in *Sea Clammers* not to preserve the federal common law nuisance claims made by the plaintiff, those claims were for substantive violations of the CWA in which the savings clause was found, and the Court explained that "[i]t is doubtful that the phrase 'any statute' includes the very statute in which this statement was contained." *Sea Clammers*, 453 U.S. at 30.[26]  By contrast, the action in this case is brought entirely under the general maritime law and not for a substantive violation of the CWA, the statute in which the savings clause is found.  This Court interprets the citations to the permits and alleged violations in the Fifth Supplemental and Amended Complaint, not as stating a substantive claim for relief under the CWA, but as stating a standard of care, the breach of which, may constitute negligence under a general maritime tort analysis.  As noted by the plaintiffs, in another context, the Fifth Circuit has acknowledged the propriety of utilizing evidence of a permit violation to demonstrate fault, in order to impose liability on a permittee.  *See Pennzoil Producing Co. v. Offshore Exp., Inc.,* 943 F.2d 1465, 1469 (5th Cir. 1991).  Moreover, contrary to

---

[26]Worthy of note is that the Third Circuit reversed the district court's decision in *Sea Clammers* which dismissed the maritime tort claims on a motion to dismiss under Rule 12(b)(6). The court held that "it was error to dismiss plaintiffs' maritime tort claims against all defendants at the pleading stage." *National Sea Clammers v. City of New York,* 616 F.2d 1222, 1236 (3rd Cir. 1980). The Supreme Court did not specifically address the maritime tort claims reinstated by the circuit court and the case was remanded. *Sea Clammers,* 453 U.S, at 11-12, fn. 17. It is not clear what became of the maritime tort claims after remand.

the defendants' argument, this Court finds that the plaintiffs' cause of action for maritime tort would still stand and be viable even in the absence of such allegations.

Unlike the plaintiffs in *Sea Clammers* and *Milwaukee*, the plaintiffs do not assert a federal common law nuisance claim.  Their claim is for negligent and intentional maritime tort under the general maritime law. The reason this distinction makes a difference is that, as the Supreme Court explained in *Milwaukee*, a nuisance theory would enable a federal district judge to substitute a different balancing of interests from the one made by the agency to which Congress assigned the job in the permit system. *See In re Exxon Valdez*, 270 F.3d 1215, 1231 (9th Cir. 2001) *citing Milwaukee ,* 451 U.S. at 320.  This case presents this Court with  no such opportunity for balancing of interests.

Finally, the defendants do not argue that the plaintiffs seek any remedies that might conflict with the decision of an administrative agency charged with enforcement responsibility.  The plaintiffs make no such claim. The penalties set forth in the CWA are for damage to public resources, enforceable by the United States, which the Court finds do not necessarily conflict with the award of compensatory damages for the private interests that may have been harmed.  The CWA does not "speak directly to" rules which limit who can recover damages in a maritime tort claim, and allowing such an action therefore will merely "fill[] a gap" in the regulatory scheme, not provide a

21

different regulatory scheme.  *In re Ballard Shipping, Co.,* 810 F.Supp. 359, 367-368

(D. Rhode Island 1993), *aff'd in part and r'vd in part on other grounds,* 32 F.3d 623 (1st

Cir. 1994) *citing Milwaukee,* 451 U.S. at 324 n. 18.

Where a private remedy does not interfere with administrative judgments (as it

would have in *Milwaukee* ) and does not conflict with the statutory scheme (as it would

have in *Sea Clammers* ), a statute providing a comprehensive scheme of public

remedies need not be read to displace a preexisting common law private remedy.  *In re*

*Exxon Valdez*, 270 F.3d 1215, 1231 (9th Cir. 2001).  It is reasonable to infer that had

Congress meant to limit the remedies for private damage to private interests, it would

have said so.  The absence of any private right of action in the CWA for compensatory

damages may more reasonably be construed as leaving private claims for maritime torts

alone than as implicitly destroying them. *Id.*

The Court's conclusion is supported by the Supreme Court's most recent

pronouncement on the subject in *Exxon Shipping Company v. Baker*, 554 U.S. 471, 128

S.Ct. 2605 (2008).  In *Exxon*, the Court affirmed the Ninth Circuit's finding that the

CWA did not displace the plaintiffs' maritime tort actions seeking punitive damages for

private economic harm occasioned by the Exxon Valdez oil spill.  The defendants

argued that the CWA's penalties for water pollution displaced the plaintiffs' common

law punitive damages remedy.  In rejecting that argument, the Court noted that the

statute regarding liability for oil spills was to protect the navigable waters, shorelines and natural resources, subject to a savings clause reserving "obligations . . . under any provision of law for damages to any . . .privately owned property." *Exxon*, 554 U.S. at 488 *citing* 33 U.S.C. § 1321(b) and (o).   The Court found "it too hard to conclude that a statute expressly geared to protecting 'water,' 'shorelines,' and 'natural resources' was intended to eliminate *sub silentio* oil companies' common law duties to refrain from injuring the bodies and *livelihoods of private individuals*." *Id*. at 488-489 (emphasis added).   Accordingly, in its final analysis, the Court found "no clear indication of congressional intent to occupy the entire field of pollution remedies, nor for that matter [did the Court]  perceive that punitive damages for private harms [would] have any frustrating effect on the CWA remedial scheme, which would point to preemption." *Id*.

In so holding, the Court expressly distinguished *Sea Clammers* and *Milwaukee* as not mandating a different result as follows:

> this case differs from two invoked by Exxon, *Middlesex County Sewerage Authority v. National Sea Clammers Assn*., 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), and *Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), where plaintiffs' common law nuisance claims amounted to arguments for effluent-discharge standards different from those provided by the CWA. Here, Baker's private claims for economic injury do not threaten similar interference with federal regulatory goals with respect to "water," "shorelines," or "natural resources."

*Id.* at fn. 7.

23

While *Exxon* was primarily concerned with § 1321 of the CWA which deals with liability for oil spills, the reasoning of the Court in reaching its result is fully applicable to the instant case.  The objective of the CWA is to "restore and maintain the . . .biological integrity of the Nation's waters. . . ."  33 U.S.C. § 1251(a).  It is hard for this Court to find that a statute geared toward maintaining the integrity of the Nation's waters was intended to eliminate *sub silento* the defendants' general maritime law duties to refrain from injuring the "livelihoods of private individuals." *Exxon*, 554 U.S. at 488-489.

Furthermore, given the savings clause set forth in § 1365(e) of the CWA, the Court finds "no clear indication of congressional intent to occupy the entire field of . . . remedies, nor for that matter [does the Court]  perceive that [compensatory] damages for private harms [would] have any frustrating effect on the CWA remedial scheme, which would point to preemption."  *Id*. at 489.  To the contrary, the Senate Report on the 1972 Amendments to the CWA states that the savings clause "would specifically preserve any rights or remedies under any other law. Thus, if damages could be shown, other remedies would remain available. Compliance with requirements under this Act would not be a defense to a common law action for pollution damages."  S. Rep. No. 92-414, pg. 81 (1971), U.S. Code Cong. & Admin. News 1972, pg. 3746-3747.  The

24

remedy of compensatory damages under the general maritime tort law is such an "other law."

Finally, this case differs from *Sea Clammers* and *Milwaukee*, where the plaintiffs' common law nuisance claims amounted to arguments for effluent-discharge standards different from those provided by the CWA. The plaintiffs do not state a claim for nuisance, nor do they seek to impose or enforce different or more stringent standards than those set forth by the CWA.  To the contrary, the plaintiffs' state claims for negligent and intentional maritime torts, and "the plaintiffs' private claims for economic injury do not threaten similar interference with federal regulatory goals" with respect to the "biological integrity of the Nation's waters."  *Exxon,* at fn. 7.

This Court's conclusion is further supported by other courts which have  drawn the same or similar conclusion.  In *Golnoy Barge Company v. M/T Shinoussa*,1993 WL 735038 (S.D. Tex. 1993), *aff'd on other grounds*, 3 F.3d 439 (5th Cir. 1993),  the district court found that a negligence action for damages asserted by commercial fishermen, after an oil spill closed the Galveston Bay, was not preempted by the CWA.  In so finding, the court distinguished both *Sea Clammers* and *Milwaukee* on various grounds, including that those cases sought remedies under common law nuisance actions, but the case before the court was based on negligence.  *Id*. at *2.

In *In re: Ballard Shipping Co.*, 810 F.Supp. 359 (D. Rhode Island 1993), *aff'd in part and r'vd in part on other grounds*, 32 F.3d 623 (1st Cir. 1994), the district court found that the CWA did not preempt the general maritime law, including the *Robins Dry Dock* rule, and therefore enforced the rule against non-fishermen seafood dealers. In so holding, the district court concluded "[d]espite the federal Act's preemption of maritime nuisance claims for damage resulting from water pollution, the Court concludes that the [CWA] does not displace all general maritime tort law regarding negligence claims . . . ." *Id*. at 367.  "Importantly, the reasoning leading courts to opine that the [CWA] preempts maritime claims based on a nuisance theory does not apply to negligence actions such as this one . . . ." *Id*.  The court stated that it had not found "that anything in the language or history of the [CWA] suggests that it 'speaks directly to' rules limiting who can recover damages in a maritime negligence tort claim." *Id*. at 367-368.

In *Poe v. PPG Industries*, 782 So.2d 1168 (La. App. 3rd Cir. 2001), a group of commercial fishermen sued under the general maritime law seeking economic damages for the loss of their livelihood as a result of the discharge of chemicals into their fishing area.  The Louisiana Third Circuit Court of Appeal held that the fishermen's claim for punitive damages was not preempted by the CWA.  In so holding, the court relied on both *Golnoy Barge* and *Ballard Shipping* to distinguish *Sea Clammers*, *Milwaukee* and

26

a contrary First Circuit case, *Conner v. Aerovox, Inc.*, 730 F.2d 835 (1st Cir. 1984)[27],  on several grounds, including that those cases dealt with federal common law nuisance claims, and not a maritime tort claim under a negligence theory.  *Id*. at 1176-1177.

In sum, this Court concludes that the CWA does not displace a private maritime tort cause of action for compensatory damages which is asserted to vindicate only private economic interests.  Stated differently, the CWA does not "speak to" private maritime tort actions seeking private remedies for private harms.  The CWA therefore does not displace the claims asserted by the plaintiffs.

**No Action under the RHA**

The plaintiffs concede that there is no  no private right of action to prevent obstructions to navigation.  This Court agrees.  *See Willamette Iron-Bridge Co v. Hatch*, 125 U.S. 1 (1888) and *California v. Sierra Club,* 451 U.S. 287 (1981).  However, the Court likewise agrees that the plaintiffs do not assert a cause of action based on obstructions to navigation.  While the plaintiffs allege that the defendants'

---

[27]The Court also finds *Conner* distinguishable and not persuasive. The plaintiffs in *Conner* did not present a maritime tort claim under a negligence theory.  Accordingly, the First Circuit noted in a footnote: "We do not consider whether such a claim [maritime tort under a negligence theory] is appropriate where intentional discharge of pollution into public waters is at issue, nor whether a negligence action for injuries due to water pollution still sounds in maritime tort after FWPCA's enactment."  *Conner*, at 838 fn. 6.  The court's holding was limited as it did not consider whether any claims for discharge occurring prior to the 1972 enactment of the amendments to the FWPCA were displaced.  *Id*. at 842 fn. 10.  This case involves conduct which predated the enactment. Finally, the *Conner* decision was rendered prior to and without the benefit of the Supreme Court's most recent decision in *Exxon*, which as discussed above, supports the conclusion reached by this Court.

conduct has caused obstructions to navigation, their cause of action is not to abate or prohibit navigational obstructions, *per se*, but rather, is based on the inability of the water to flow freely around and on top of these obstacles, which has thereby allegedly caused them injury.  As such, the Court finds that plaintiffs seek no remedy, or substantive relief under, the RHA. Summary Judgment is therefore not properly granted.

## **Recommendation**

For the reasons stated above;

**It is recommended** that, the Motion for Summary Judgment [rec. doc. 546] be **denied** as the defendants are not entitled to judgment as a matter of law.

Under the provisions of 28 U.S.C. Section § 636(b)(1)(C) and Fed. R. Civ. P. Rule 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this report and recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual

findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).


Signed this 28th day of October, 2015, at Lafayette, Louisiana.


_____

**PATRICK J. HANNA**
**UNITED STATES MAGISTRATE JUDGE**